

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

United States District Courthouse
300 Quarropas Street
White Plains, New York 10601

October 12, 2021

**BY ECF & HAND**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
The Hon. Charles L. Brieant Jr. United States Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re:   *United States v. Emil Garcia,* **21cr405 (KMK)**

Dear Judge Karas:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for October 19, 2020 at 2:00 p.m.  For the reasons explained below, the Government submits that a custodial sentence within the applicable Guidelines range is appropriate.

**A.  Factual Background**

1. <u>The Offense Conduct</u>

The relevant offense conduct is set forth in detail in the Pre-Sentence Report ("PSR"). The following investigation was conducted by special agents with the Internal Revenue Service ("IRS"), the Drug Enforcement Administration ("DEA"), the United States Attorney's Office ("USAO"), and the Westchester County District Attorney's Office ("WCDAO").

a. <u>Background</u>

In 2010, the IRS began utilizing detectives in the narcotics unit of the Westchester County Police Department ("WCPD") as Task Force Officers ("TFO") as part of the IRS's participation in the New York Organized Crime Drug Enforcement Strike Force ("Strike Force"). ¶ 7. The Strike Force is a federal task force run by the DEA, that is comprised of the DEA, IRS, and other law enforcement.

In April of 2013, GARCIA became a TFO with the IRS team in the task force. ¶ 8. GARCIA had several responsibilities as a TFO, including picking up money from DEA targets and cultivating new confidential informants. GARCIA reported to two IRS Special Agents ("Special Agent-1" and "Special Agent-2," respectively and "the Special Agents," collectively).

Sometime during April or May of 2013, GARCIA informed the Special Agents of a discussion he had with an individual who had an auto shop on Jerome Avenue, in the Bronx, New York ("CS-1). ¶ 9. CS-1 allegedly told GARCIA that an individual who went by the street name "Chino" had been buying cars, installing traps in them, and shipping them with drug proceeds to Puerto Rico and the Dominican Republic. The cars were then shipped back with narcotics. CS-1 further allegedly stated that he had learned that a trap maker had installed a trap in a vehicle for Chino (the "Trap Maker"). CS-1 additionally allegedly reported that the Trap Maker had later learned that the vehicle was linked to a target of the investigation ("Target-1").

Soon after, GARCIA proposed to the Special Agents that they should flip the Trap Maker and use him as a confidential informant. ¶ 10. GARCIA, the IRS, and DEA approached the Trap Maker and signed him up as a CI. GARCIA was not officially the Trap Maker's handler; however, GARCIA was the primary contact with the Trap Maker because the Trap Maker spoke Spanish and GARCIA was the sole Spanish speaker in the group.

On May 16, 2013, the DEA and IRS opened a joint investigation into two targets: Target-1 and an unidentified individual that went by the street name, "Chino" ("Target-2"). ¶ 11. The Strike Force focused its investigation on body shops located on Jerome Avenue, in the Bronx, New York. ¶ 12. These shops had a reputation for building traps for narcotics-related activity. The operation was named "Trap City."

During the next several months, the Strike Force, including GARCIA, surveilled multiple targets located on Jerome Avenue using intelligence from the Trap Maker. ¶ 13. On July 23, 2013, the task Force applied for Organized Crime Drug Enforcement Task Force ("OCDETF") and Group I authorization. Thereafter, on December 13, 2013, the Strike Force obtained a court order authorizing the installation of GPS tracking devices on two vehicles. An Assistant United States Attorney ("AUSA") from the narcotics unit from the UUSAO drafted the GPS application and opened a file. The tracking devices were installed, but the vehicles were never subsequently moved by their owners.

The Trap City investigation largely went dormant after the failed GPS monitoring plan. ¶ 15. On May 29, 2014, the USAO formally closed its investigation. According to the AUSA's closing notes, "The confidential source lost contact with the targets. [CS-1] + [Target-1]. Efforts to reengage [CS-1] with them and to locate them through a GPS tracking warrant were unsuccessful because the targets dropped their phones." Then, on October 28, 2014, the DEA filed a case closing report stating, "Then, on October 28, 2014, the DEA filed a case closing report stating, "As of October 28, 2014 all investigative leads of this investigation no evidence was seized and no arrests were made. Therefore this case will be submitted for administrative closing on this date."

b.  The Mortgage Application

Approximately 18 months later, on June 3, 2016, EMIL GARCIA applied for a $240,000 loan from Angel Oak Mortgage Solutions LLC (a mortgage lending business) to purchase a house in Naples, Florida. ¶ 16. GARCIA used a mortgage broker called Innovative Mortgage Services,

Inc., to structure this transaction. On June 14, 2016, a representative from the mortgage broke emailed GARCIA about the application. The broker notified GARCIA through email that he had a "conditional loan approval." The representative added, "this means the underwriter has gone over your file and they have question [sic] and documents need updated." The representative accordingly informed GARCIA that several cash deposits into his bank account "will need a written explanation" and that the "deposit will need to be backed up with documentation."

GARCIA emailed the representative back several hours after receiving the email from the broker. ¶ 17. The email contained several attachments. The first was a typed letter from GARCIA dated June 14, 2016. The letter stated the following:

> As per your request in this letter is to provide more information regarding some deposits showing in my bank account:
>
> In January 2014 I went to Auto Auction with my friend of 20 Years [Target-1], [Target-1] is a used vehicle dealer and brought me to the Auto Auction. I purchased a vehicle for around $7,500 that needed some repairs, after making all the necessary repairs my wife did not like the vehicle and we decided to sell it instead. [Target-1] sold it at his dealership for $13,000 and asked me if I could lend him that money plus $5,000 more totalling [sic] $18,000 since he was struggling with his business. Since I know [Target-1] for some 20 years and with the consent of my wife I lended [sic] the money to him without any interest just in good faith. Recently [Target-1] made some payments to me totaling $17,000 which I deposited, here is the breakdown:
>
>> 03/27/16 $5,000
>>
>> 05/07/16 $6,000
>>
>> 05/16/16 $6,000
>>
>> Also, there are 2 more deposits in question and here are the descriptions
>>
>> 04/20/2016 $5,100 that as a Bank to Bank transfer NO a cash deposit
>>
>> 05/03/2016 $6,602 that was a Check from Geico Insurance NO a cash deposit
>
> Please find attached documents: Letter between [Target-1] and me, Receipts and pay stub from Geico's accident check.

GARCIA next attached a handwritten letter allegedly dated March 6, 2014. ¶ 18. According to the 2014 letter:

> I, Emil Garcia residing at 42 Dutch Hollow Drive certified [sic] that I will lend [Target-1] the amount of $18,000 dollar [sic] today, March 6, 2014. [Target-1] will pay me back in small installments as he improves his sells [sic] at his dealership. [Target-1] will not pay

me any interest and if something happen [sic] to me he will pay my wife then. [Target-1] asked me for 3 to 4 years to pay and I granted it due to our 20 years [sic] friendship.

Copies:  1 for my mother
1 more [Target-1]
1 for Angela—Wife

The letter signed, "Emil Garcia 3-6-14." Below GARCIA's signature is a handwritten line: "I, [Target-1] agree with all the conditions described above by Mr. Emil Garcia." It is followed by the signature, "[Target-1] 3/6/14."

GARCIA lastly attached three receipts allegedly documenting Target-1's cash payments (collectively, the "Cash Receipts"). ¶ 19. The three cash receipts list a $5,000, $6,000, and $6,000 payment, respectively.



GARCIA subsequently received the $240,000 mortgage.

c.  The Officer-1 Traffic Stop

At approximately the same time, in or about July 2016, the WCDAO began an investigation into an officer with the Westchester County Police Department ("Officer-1"). ¶ 20. The investigation arose out of a traffic stop conducted by Officer-1 earlier that month. Officer-1 stated in his initial report that he had pulled over the vehicle, located a trap, and withdrew approximately 10 kilograms of heroin. He did not report being assisted by any other law enforcement officer. Soon after; however, Officer-1 filed an amended report after realizing that his dash cam had been functional. The amended report added that GARCIA had been at the traffic stop. Based on this and other suspicious circumstances, the Westchester County District Attorney ("WCDA") began investigating GARCIA and Officer-1.

The WCDA subpoenaed GARCIA's financial records in connection with the investigation and uncovered the above-described mortgage application. ¶ 21. When the IRS learned of the investigation, GARCIA was immediately removed from the Task Force and he returned to the WCPD where he was given a desk assignment. The Task Force then notified six law enforcement affiliates that they should not use evidence collected or obtained by GARCIA. According to Special Agent-2, this had a significant and severe effect on several of these investigations.

### d.   The IRS Interviews

The IRS interviewed Special Agent-1 in September of 2017, July of 2019, and January of 2020. ¶ 22. Special Agent-1 stated that the investigation into Target-1 started with the Trap Maker and that GARCIA was the Trap Maker's handler. Special Agent-1 further stated that GARCIA was a highly effective undercover. It was revealed that GARCIA never told Special Agent-1 that he had any type of personal or business relationship with Target-1.

The IRS then interviewed Special Agent-2 in January of 2020. ¶ 23. Special Agent-2 was the lead case agent on the Target-1 investigation and the Trap Maker's handler. Special Agent-2 stated that GARCIA was the primary contact with the Trap Maker and that Special Agent-2 would periodically reach out to GARCIA to see if the Trap Maker had any additional information about Target-1. GARCIA never told Special Agent-2 that he had any type of personal or business relationship with Target-1.

The IRS lastly interviewed a third IRS Special Agent ("Special Agent-3"). ¶ 24. Special Agent-3 was a member of the group and was a co-case agent with Special Agent-3 on the Target-1 investigation. Special Agent-3 recalls that GARCIA gave him and Special Agent-3 the information that led to the investigation of the case on Target-1. Information provided by the Government revealed that Special Agent-3 assumed GARCIA received this information from the Trap Maker because GARCIA was the Trap Maker's handler. GARCIA reportedly never told Special Agent-3 that he had any type of personal or business relationship with Target-1.

### e.   The September 2019 GARCIA Interview

On September 18, 2019, Special Agents with the USAO and IRS approached GARCIA at this house in Rockland County, New York. ¶ 25. GARCIA agreed to speak with the agents and the

interview was recorded. GARCIA stated that he had known Target-1 for approximately 15 years and that they were friends.

Information provided by the Government revealed that GARCIA falsely stated during the interview that he did not talk to Target-1. ¶ 26. When asked, "while the investigation is on, while it was going on. Did you talk to uh, [Target-1]?" to which GARCIA responded, "while he was on, no I distanced myself." GARCIA further added that he "should have never opened a case on [Target-1]." GARCIA stated that he "thought [Target-1] was involved with a guy named Chino," who "was a guy that was a huge drug dealer," but GARCIA "found no proof" that Target-1 was involved. He additionally falsely stated that he told other law enforcement officers on the Strike Force of his relationship: "I said yeah, I know the U/I for fifteen years, you know, some of the guys in the office were making fun of me. You know the guy for fifteen years you wanna fuck him."

GARCIA was additionally asked whether he had loaned money to Target-1. ¶ 27. GARCIA stated that he might have loaned him $3,000 at one point. GARCIA was then shown the letters from the mortgage loan application. GARCIA stated that he never loaned Target-1 $18,000. He additionally stated that the letter he wrote in 2014 was possibly backdated. GARCIA ended the interview shortly thereafter.

f.   The December GARCIA Interview

GARCIA subsequently participated in a second interview with the USAO on December 5, 2019. ¶ 28. GARCIA was represented by counsel during this interview. GARCIA was warned at the beginning of the interview that making false statements to a federal agent is a crime. GARCIA stated that he met Target-1 in approximately 1998 or 1999. He described their relationship as "acquaintances." GARCIA estimated that he had bought 12 cars from Target-1 over the course of their relationship. Target-1 additionally sold five to six cars for GARCIA between 2007 and 2012. GARCI allegedly allowed Target-1 to keep the money from the sales and pay GARCIA back at a later date. GARCIA additionally stated that he only called Target-1 when he wanted to talk "business," i.e., buying or selling cars.

GARCIA stated that sometime in 2013, he was on Jerome Avenue, in the Bronx, New York in CS-1' shop. ¶ 29. CS-1 allegedly told him that an individual that went by the street name "Chino" had been buying cars, installing traps in them, and shipping them with drug proceeds to Puerto Rico and the Dominican Republic. The cars were then shipped back with narcotics. CS-1 further allegedly stated that he had learned that the Trap Maker had installed a trap in a vehicle for Chino. CS-1 additionally allegedly reported that the Trap Maker had later learned that the vehicle was linked to Target-1. GARCIA further falsely stated that he told the Special Agents that he had been friends with Target-1 and had bought and sold cars from them.

GARCIA stated that he had no further involvement in investigating Target-1 thereafter. ¶ 30. He did not participate in surveillance, and never knew the investigation into Target-1 had become a full case. He instead reported that he thought that the Strike Force simply had an "inquiry" into Target-1.

GARCIA then admitted that he had made false statements on his mortgage loan application. ¶ 31. GARCIA stated that the 2014 Letter was inaccurate. GARCIA never sold Target-1 a vehicle or loaned him money in 2014. GARCIA instead sold Target-1 the vehicles that were the subject of the letter in 2016. GARCIA stated that he backdated the letter on the advice of the mortgage broker. According to GARCIA, the mortgage broker told him that he ordinarily would need to provide documentation to the bank showing the reason for cash deposits. However, if the loan was sufficiently old, the bank would not require supporting documentation. GARCIA further stated that the Cash Receipts he provided were phony and had been prepared on the same day that he received the email from the mortgage broker asking for additional information.

GARCIA admitted to making two other false statements in the mortgage application. ¶ 32. In addition to the false 2014 Letter, GARCIA falsely stated that he was no longer operating a home business. GARCIA further failed to disclose a $10,000 debt he owed to a co-worker.

g.  GARCIA's Lies to Federal Agents

The Government's investigation revealed that during an interview between GARCIA and IRS special agents in September of 2019, GARCIA falsely informed special agents that he did not talk to Target-1 when asked if he had conversations with Target-1 during the investigation. ¶ 33. GARCIA additionally informed special agents that he distanced himself from Target-1 during the investigation.

During an interview between GARCIA and the U.S. Attorney's Office in December of 2019, GARCIA was informed at the beginning of the interview that making false statements to a federal agent is a crime. ¶ 34. During this interview, GARCIA falsely stated to the U.S. Attorney's Office that he told the Special Agents that he had been friends with Target-1 and had bought and sold cars from them. Information from the Government revealed that GARCIA never told the Special Agents that he had any type of personal or business relationship with Target-1.

2.  The Plea Agreement

On or about June 21, 2021, the defendant pleaded guilty, pursuant to a plea agreement, to Count One of a one count Information. The plea agreement calculated the offense level as 6, the Criminal History Category as I, and the Stipulated Guidelines Range as 0 to 6 months' imprisonment.

**B.  The Presentence Report**

Pursuant to USSG §2B1.1(a)(1), the PSR calculates the offense level as 7 instead of 6 because a violation of 18 U.S.C. § 1014 is an offense referenced to this guideline and has a statutory maximum term of imprisonment of 20 years of more. ¶ 40. The PSR further recommends a sentence of time served. The PSR reasons that the defendant has a low risk of recidivism, has a stable support network, and suffers health effects from responding to Ground Zero.

## C.  The Defense Submission

The defense submission asks the Court to impose a sentence of time served. The defense submission notes, among other things, that the defendant grew up in an impoverished neighborhood in the Dominican Republic, overcame significant adversity to immigrate to the United States and become a police officer, and suffered personal harm from responding to Ground Zero.

## D.  Discussion

### 1.   Applicable Law

As the Court is well aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49.  After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6.  In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.  A Custodial Sentence Is Appropriate in this Case

For the reasons set forth below, the Government submits that a custodial sentence within the applicable Guidelines range is appropriate.

First and foremost, a custodial sentence is necessary to reflect the seriousness of the offense. The defendant was a police officer—a member of the community whose sole responsibility was to promote respect for the law. When a police officer violates that duty, it sends

a signal that public servants believe they are above the law. It breeds mistrust of our system of justice. And it taints every investigation and prosecution the police officer has ever touched.

This case illustrates the toxic touch of this breach of trust. As set forth in the PSR, the defendant hid from law enforcement members that he had a personal and financial relationship with the target of a major narcotics investigation—Target-1. ¶¶ 22-24. He then repeatedly contacted Target-1 during the pendency of the investigation without notifying his supervisors. *Id.* These decisions were not an isolated lapse in judgment. They were calculated conduct spanning nearly a year. They also violated the most basic principle of police work. You cannot investigate someone with whom you share a conflict of interest.

The defendant's misconduct only worsened when the investigation concluded. Approximately 18 months later, in June 2016, the defendant sought to obtain a $240,000 mortgage. The federal government and financial entities require down payments to ensure that borrowers can repay their obligations. The defendant, however, had $17,000 in unexplained cash deposits into his bank account that he wanted to use for the down payment. The bank wanted to know why. ¶¶ 16-19.

For ordinary members of the public, this means telling the truth. For the defendant, this meant a series of lies. The defendant fabricated that the unexplained cash deposits were a loan. He fabricated that the loan was from the target of his prior investigation—Target-1. He fabricated two letters memorializing the loan. He fabricated three receipts documenting alleged repayments of the loan. And he created all these false documents during a single evening. *Id.* Because the defendant was a police officer, and the rules did not apply to him.

The defendant received his mortgage. And he kept lying. He lied to law enforcement agents in September 2020 when they came to interview him in connection with this investigation. ¶¶ 25-32. He then traveled to the United States Attorney's Office in December 2020 with counsel and sat in a room with half a dozen members from the Office including agents and prosecutors. *Id.* He lied once again. *Id.* During the two interviews, the defendant falsely stated that he did not speak with Target-1 during the investigation. He falsely stated that he notified his fellow officers of his personal and financial conflict of interest with Target-1. He also falsely stated that Target-1 lent him the unexplained cash deposits in his bank account. *Id.* Because the defendant was a police officer, and the rules did not apply to him.

These actions have consequences. The defendant undoubtedly was a decorated police officer. But because of his repeated crimes, IRS has had to notify six law enforcement affiliates that they should not use evidence collected or obtained by him. This had a significant and severe effect on several of these investigations. ¶ 21. Years of law enforcement work have been tainted and rendered unusable. Because the defendant believed he was above the law.

The Government has no doubt that the defendant has overcome great adversity in life. He has made sacrifices for his country. Yet public service does not make anyone above the law. That holds true for police officers.

**E.  Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a custodial sentence within the applicable Guidelines range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Mathew S. Andrews
Assistant United States Attorney
(212) 637-6526